# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **WSOU INVESTMENTS LLC, d/b/a BRAZOS LICENSING AND DEVELOPMENT,** | § § § § | **Civil Case No. 6:20-cv-574-ADA**<br>**Civil Case No. 6:20-cv-576-ADA**<br>**Civil Case No. 6:20-cv-579-ADA**<br>**Civil Case No. 6:20-cv-580-ADA** |
| **Plaintiff,** | § § | |
| **v.** | § § | **JURY TRIAL DEMANDED** |
| **GOOGLE LLC,** | § § | |
| **Defendant.** | § § | |

**SUR-REPLY IN SUPPORT OF DEFENDANT**
**GOOGLE LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

Page

I. U.S. PATENT NO. 7,946,491 (CASE NO. 6:20-CV-580-ADA) ................................... 1

    A. "the input image" (claims 1, 13, 25, and 41) .................................................... 1

    B. "performing a correction on the input image" (claims 1, 13, 25, and 41) .......... 2

    C. "new frame" (claims 1, 13, 25, and 41) ............................................................. 3

    D. Disputed Means-Plus-Function Terms ............................................................... 4

        1. "means for processing an input image for an attempt to decode the input image using a current barcode reading method, the processing including performing a correction on the input image" (claim 41) ............................................................................................. 4

        2. "means for determining whether the processing of the input image is successful based on a determination as to whether the correction is completed" (claim 41) ............................................................................ 5

        3. "means for switching to one of a different barcode reading method or processing a new frame of the input image using the current barcode reading method in response to the processing of the input image being unsuccessful" (claim 41) ........................................................ 6

        4. "means for attempting a decode of the input image using the current barcode reading method in response to the processing of the input image being successful" (claim 41) ............................................ 6

        5. "means for performing a switch to the different barcode reading method in response to a failure of the attempt to decode the input image using the current barcode reading method" (claim 41) .................. 7

        6. Whether the phrase "computer program product comprising at least one computer-readable storage medium having computer-readable program code portions stored therein, the computer-readable program code portions comprising: . . . a first/second/third/fourth/ fifth executable portion for . . ." invokes Section 112 ¶ 6 (claim 13)........ 7

        7. Whether the phrase "apparatus comprising a processor and memory including computer program code, the memory and the computer program code configured to, with the processor, cause the apparatus at least to: . . ." invokes Section 112 ¶ 6 (claim 25) ............ 8

II. U.S. PATENT NO. 8,595,283 (CASE NO. 6:20-CV-576-ADA) ................................. 10

    A. "the selected item of content" (claims 1, 2, 3, 10, 21)...................................... 10

    B. "monitoring usage of one or more components . . . over a particular time duration" (claims 1, 10) .................................................................................. 10

    C. "an acceptable level of device activity" (claim 21) .......................................... 11

# TABLE OF CONTENTS
## (continued)

Page

D. "a content transfer controller configured to determine an acceptable activity period by monitoring usage of the one or more components over a particular time duration, and wherein the content transfer controller is configured to determine that an acceptable activity period is present when the usage of the one or more components is determined to have been below a particular threshold level over the particular time duration" (claim 1) ........................................................................................ 13

E. "the content transfer controller being arranged: to initiate transfer of the selected item of content from a content provider device according to the determination of an acceptable activity period, to receive the selected item of content, and to store the received item of content on memory" (claim 1) ......................................................................................... 14

III. U.S. PATENT NO. 8,640,180 (CASE NO. 6:20-CV-579-ADA) .................................. 15

A. "client-side compositing of media streams" (all claims) ................................. 15

B. "the compositing-instruction substream indicating the area of the display screen to display the at least one media substream is an area to display one of the on screen display and a picture in picture" (claims 8 and 21) ......... 16

IV. U.S. PATENT NO. 8,965,045 (CASE NO. 6:20-CV-574-ADA) ................................... 17

A. "pre-emptive user output" (all claims) ............................................................. 17

B. "processor configured to provide a pre-emptive user output when the sub-set of pixels approaches an edge of the set of available pixels" (claim 1) ......................................................................................................... 19

# TABLE OF AUTHORITIES

Page

CASES

*Blackboard, Inc. v. Desire2Learn, Inc.*,
574 F.3d 1371 (Fed. Cir. 2009)........................................................................20

*Collaborative Agreements, LLC v. Adobe Systems Inc.*,
Case No. 14-356, 2015 WL 2250391 (W.D. Tex. 2015)...................................9, 10

*Diebold Nixdorf, Inc. v. ITC*,
899 F.3d 1291 (Fed. Cir. 2018)........................................................................19

*Digital Retail Apps, Inc. v. H-E-B, LP*,
Case No. 19-167, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020) ..............................3

*Dyfan, LLC v. Target Corp.*,
Case No. 19-179, Dkt. No. 57 (W.D. Tex. Nov. 24, 2020) ...........................8, 9, 20

*Edward Lifescie. LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009)........................................................................18

*Egenera, Inc. v. Cisco Sys., Inc.*,
972 F.3d 1367 (Fed. Cir. 2020)....................................................................19, 21

*Flash-Control, LLC v. Intel Corp.*,
Case No. 19-1107, 2020 WL 4561591 (W.D. Tex. July 21, 2020) ...........................3

*Graham v. John Deere Co.*,
383 U.S. 1 (1966).............................................................................................2

*InCom Corp. v. Radiant RFID, LLC*,
2018 WL 4690934 (W.D. Tex. Sept. 28, 2018).....................................................14

*Indacon, Inc. v. Facebook, Inc.*,
824 F.3d 1352 (Fed. Cir. 2016)....................................................................18, 19

*Intellectual Ventures LLC v. T Mobile USA, Inc.*,
5809270, at *12 (E.D.Tex. 2018) ......................................................................13

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014).........................................................................13

- iii -

*IQASR LLC v. Wendt Corp.*,
   825 F. Appx. 900 (Fed. Cir. 2020) ..........................................................................14

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
   383 F.3d 1295 (Fed. Cir. 2004) ..............................................................................17

*Media Rts. Techs., Inc. v. Capital One Fin. Corp.*,
   800 F.3d 1366 (Fed. Cir. 2015) ..............................................................................21

*MonkeyMedia, Inc. v. Apple, Inc.*,
   2013 WL 12076550 (W.D.Tex. Feb. 22, 2013) .......................................................14

*Multilayer Stretch, Inc. v. Berry Plastics Corp.*,
   831 F.3d 1350 (Fed. Cir. 2016) .........................................................................17, 19

*Noah Sys., Inc. v. Intuit Inc.*,
   675 F.3d 1302 (Fed. Cir. 2012) .............................................................................4, 5

*Omega Eng'g, Inc, v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) .....................................................................2, 11, 12

*Optis Cellular Tech. v. Kyocera Corp.*,
   2017 WL 541298, at *26 (E.D. Tex. 2017) .............................................................20

*Personalized Media Comms., LLC v. Apple Inc.*,
   952 F.3d 1336 (Fed. Cir. 2020) ..............................................................................11

*Poly-Am., L.P. v. GSE Lining Tech. Inc.*,
   383 F.3d 1303 (Fed. Cir. 2004) ..............................................................................15

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*,
   Case No. 2020-1646, 2021 WL 786361 (Fed. Cir. Mar. 2, 2021) .................8, 14, 15

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
   653 F.3d 1296 (Fed. Cir. 2011) ..............................................................................19

*St. Isadore Research, LLC v. Commerica*,
   2016 WL 4988246, at *14, *18 (E.D. Tex. 2016 ....................................................20

*TF3 Ltd. v. Tre Milano, LLC*,
   894 F.3d 1366 (Fed. Cir. 2018) ..............................................................................18

*Trading Techs. Int'l, Inc. v. eSpeed Inc.*,
   595 F.3d 1340 (Fed. Cir. 2010) ..............................................................................18

*Trinity Indus., Inc. v. Road Sys., Inc.*,
121 F. Supp. 2d 1028 (E.D. Tex. 2000) ...................................................................8

*Uniloc 2017 LLC v. Google LLC*,
Case No. 18-492, 2020 WL 569858 (E.D. Tex. Feb. 5, 2020) ...................................9

*Uniloc 2017 LLC v. Google LLC*,
Case No. 20-5333, Docket No. 355 (N.D. Cal. Dec. 22, 2020) ................................9

*Vizio, Inc. v. ITC*,
605 F.3d 1330 (Fed. Cir. 2010) ...............................................................................16

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ...............................................................9, 10, 20, 21

## STATUTES

35 U.S.C. § 112, ¶ 6 ........................................................................................ passim

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| Ex. 19 | Plaintiff's Infringement Contentions for U.S. Patent No. 7,946,491 |

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| WSOU | Plaintiff WSOU Investments, LLC d/b/a Brazos License and Development |
| Google | Defendant Google LLC |
| '491 patent | U.S. Patent No. 7,946,491 |
| '180 patent | U.S. Patent No. 8,640,180 |
| '045 patent | U.S. Patent No. 8,965,045 |
| '283 Patent | U.S. Patent No. 8,595,283 |
| Group 2 Patents | Collectively, U.S. Patent Nos. 7,946,491; 8,640,180; 8,965,045; and 8,595,283 |
| POSITA | Person Of Ordinary Skill In The Art |

\* *Emphasis added unless indicated otherwise.*

\*\* *For the Court's convenience, Google cites to WSOU's opening brief, Google's responsive brief, and WSOU's reply brief by referring to the briefs and exhibits filed in Case No. 6:20-cv-576-ADA (which is the same for all of the above-captioned cases) and to the pagination generated by CM/ECF (at the top of the page) rather than the pagination at the bottom of the page.*

## I.       U.S. PATENT NO. 7,946,491 (CASE NO. 6:20-CV-580-ADA)

### A.       "the input image" (claims 1, 13, 25, and 41)

The question before the Court is whether a reference to "an input image" followed by multiple references to "the input image" all refer to the same image, as Google contends—or, as WSOU argues, allow (or perhaps require) some (but not all) instances of "the input image" to refer to some other (unspecified) image with no antecedent basis.  WSOU attempts its familiar two-step shuffle:  first assuming that its interpretation represents the plain and ordinary meaning, and then asking the Court to adopt "plain and ordinary meaning" as the construction.  As it does elsewhere, this two-step fails:  the Court should not find a term to have its plain and ordinary meaning where the parties dispute that meaning, and if there *is* a plain and ordinary meaning of "the input image," it refers to the original "input image" as its antecedent basis.

WSOU claims that "the step 'attempting a decode of the input image . . . in response to the processing of the input image being successful' makes explicit reference to 'the input image' resulting from the 'processing' involving successful completion of a correction," and thus cannot be the original image.  (Dkt. 36 at 8.)  But WSOU cannot put the word "resulting" in quotes, because the claims say no such thing; instead, they address how to proceed with "the input image" based on "determining whether the processing of the input image is successful"—explicitly referencing the *success or failure* of a test, but not the *output generated* by that test.  (*E.g.*, Ex. 1 at 20:23-25.)  Had the patentee wished to claim the output, it could have referred to "the processed image" or anything other than "the input image"; it did not.

WSOU's construction would also wreak havoc by requiring "input image" to mean different things throughout the claims.  Consider claim 1, which has one invocation of "an input image" followed by eight invocations of "the input image," for a total of nine.  Although WSOU's briefing does not make this totally clear, it appears that the first, second, third, fourth, sixth and eighth instances of "input image" would mean one thing, while the fifth and seven instances of "input image" would mean something else.  (Ex. 1 at 20:18-36.)  WSOU thus asks the Court, under the guise of "plain and ordinary meaning," to construe the *same* term as having *different* meanings

throughout each claim.  The Court should decline this invitation, follow the normal rules of claim construction, and construe "input image" to be the same throughout, with "the input image" referring to its antecedent basis, "an input image."[1]

**B.**    **"performing a correction on the input image" (claims 1, 13, 25, and 41)**

Long-standing law excludes "any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."  *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985); *cf. Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent").  That is precisely what happened here.  As Google explained in its opening brief, the examiner rejected claims because Zhu "would inherently include correcting of the image for analyzing before decoding the image," and the applicants responded by accepting the examiner's understanding of Zhu but arguing that it did not matter because that disclosure "clearly could (and likely does) only involve examination of content to conduct the search without any correction to the content whatsoever," after which the examiner allowed the claims.  (Dkt. 34 at 15.)  The patentee thus distinguished Zhu on the *sole ground that it did not correct content*; although WSOU claims that these events do not constitute a "clear and unmistakable" disclaimer (Dkt. 36 at 8 (quoting *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013)), if they do not, it is hard to know what does.

WSOU claims that the applicants wanted "[t]o emphasize the point that those three cited activities of Zhu do not expressly or inherently disclose 'some form of correction.'"  (Dkt. 36 at 9.)  But WSOU strips out the applicants' express reasoning for this distinction—that the claimed "some form of correction" *requires* "correction to the content."  (Dkt. 34 at 15.)[2]  WSOU also fails

---

[1]    This construction would also give meaning to the word "input" in "input image," while WSOU's would not.  (*See* Dkt. 34 at 12-13.)  WSOU failed to respond to this argument.

[2]    WSOU briefly argues that "the correction" lacks antecedent basis and does not specify whether a correction must be to all content, or merely some.  (Dkt. 36 at 9.)  Google's

2

to address that one of "those three cited activities of Zhu" (Dkt. 36 at 9) is "marking the corners of an ROI" (Ex. 5 at 4), which WSOU directly accuses of infringement in this action.  (Ex. 19 at 6 ("The Google Mobile Vision API allows a user to adjust the corners of the region of interest denoted by the box, thereby performing a type of correction on the input image.").)  WSOU thus seeks to pursue, in the guise of "plain and ordinary meaning," specific functionality the applicants distinguished.  The Court should decline this invitation, and give meaning to the applicants' understanding of their claims.

C.     "new frame" (claims 1, 13, 25, and 41)

WSOU's arguments against indefiniteness are remarkable for what they do not contain: *any* definition or explanation of what a "new frame" means in the context of the '491 patent.  (Dkt. 36 at 10-11.)  WSOU implies that "new frame" might include a "next sequential frame" (*Id.* at 11), but fails to address Google's explanation of the insufficiency of that term (Dkt. 34 at 18), and instead asks the Court to assume that a person of skill would understand it.  (Dkt. 36 at 5.)  Worse, WSOU explicitly fails to limit "new frame" to "next sequential frame," rendering the latter useless in limiting the boundaries of the former, and confirming that "new frame" does not "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Flash-Control, LLC v. Intel Corp.*, Case No. 19-1107, 2020 WL 4561591, at *3 (W.D. Tex. July 21, 2020) (quoting *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014)).

Unable to address the main event, WSOU focuses on sideshows.  It argues that Google should have presented extrinsic evidence, but "[a]lthough extrinsic evidence can also be useful, it is less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Digital Retail Apps, Inc. v. H-E-B, LP*, Case No. 19-167, 2020 WL 376664, at *2 (W.D. Tex. Jan. 23, 2020) (internal quotations omitted).  WSOU repeats incorrect accusations about disclosure, without addressing Google's response.  (*Compare* Dkt. 36 at 10-11 *with* Dkt. 34 at 7 n.2.)  And it claims that Google should have focused on the patent's inoperativeness and lack

---

construction followed the statements of the applicants in prosecution (Ex. 5 at 4); still, to avoid any confusion, Google would accept "any content" instead of "the content."

of enablement, which may be helpful advice for the future, but does nothing to counter Google's indefiniteness arguments now.  This term is indefinite.

### D.    Disputed Means-Plus-Function Terms

**1.    "means for processing an input image for an attempt to decode the input image using a current barcode reading method, the processing including performing a correction on the input image" (claim 41)**

| Google's Construction | WSOU's Construction |
|---|---|
| This term is subject to means-plus-function treatment under 35 U.S.C. § 112, ¶ 6.<br><br>Function: "processing an input image for an attempt to decode the input image using a current barcode reading method, the processing including performing a correction on the input image"<br><br>Structure: 9:58 to 11:23, 15:25 to 16:52 | Function: "processing an input image for an attempt to decode the input image using a current barcode reading method."<br><br>Structure: barcode reading element 70, processing element 72, operation 200. |

WSOU's claimed structure betrays WSOU's arguments.  First, WSOU argues the modifying clause of "the processing including performing a correction on the input image" does "not recite a separate function, as Google argues, but rather it recites an algorithmic (and hence structural) requirement for the 'processing' itself."  (Dkt. 36 at 17.)  Although this is not correct for the reasons Google stated in its opening brief (Dkt. 34 at 20), WSOU's proposed structure fails to provide any support for "the processing including performing a correction on the input image": barcode reading element 70 is merely hardware for barcode reading, processing element 72 is a general purpose computer, and operation 200 merely restates the function.  (*See* Ex. 1 at 8:52-57, 9:30-35, Fig. 3; *see Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1316-17 (Fed. Cir. 2012) ("The portions of the specification that describe what occurs inside box 44, however, merely recite functional, not structural, language.  This type of purely functional language, which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure.") (internal citations omitted).)  Finally, as Google explained (Dkt. 34 at 20), the specification includes separate structure for the separate functions of

"processing an input image for an attempt to decode the input image using a current barcode reading method" at lines 9:58 to 11:23, and "performing a correction on the input image" at lines 15:25 to 16:52.  Though WSOU argues that "Google fails to parse its unexplained citations in terms of which disclosure contained therein allegedly pertains to which one of the allegedly 'separate functions,'" to the extent that this is not obvious, Google did so already in its previous brief.  (*Id.*; Dkt. 36 at 17.)

    2.    **"means for determining whether the processing of the input image is successful based on a determination as to whether the correction is completed" (claim 41)**

| Google's Construction | WSOU's Construction |
|---|---|
| This term is subject to means-plus-function treatment under 35 U.S.C. § 112, ¶ 6.<br><br>Function: "determining whether the processing of the input image is successful based on a determination as to whether the correction is completed"<br><br>Structure: none (indefinite) | Function: "determining whether the processing of the input image is successful based on a determination as to whether the correction is completed"<br><br>Structure: processing element 72, operations 210-230 |

Confronted with deficiencies in its selected structure (*see* Dkt. 34 at 20-26), WSOU declined to defend it and instead called an audible, dropping its lengthy lists of structure and substituting shorter selections.  (Dkt. 36 at 18.)  Even assuming WSOU's tardy trades are valid— a big assumption—they cannot help WSOU, because they merely restate the words of the function. (*E.g.*, Dkt. 34 at 21; *see Noah*, 675 F.3d at 1316-17 ("The portions of the specification that describe what occurs inside box 44, however, merely recite functional, not structural, language.  This type of purely functional language, which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure.") (internal citations omitted).)  WSOU does not even attempt to address Google's arguments, instead reciting boilerplate that "Google has not met the exacting burden of clear and convincing evidence."  (Dkt. 36 at 17.)  These means-plus-function terms remain indefinite for the same reasons that Google

explained in its opening brief.  (Dkt. 34 at 21-26.)

WSOU's claimed structure for "means for determining whether the processing of the input image is successful based on a determination as to whether the correction is completed" is processing element 72, which the specification explains is just a general purpose computer.  (*Id.* at 22; *see also, e.g.*, Ex. 1 at 9:30-35.)  Operation 210 merely restates the function, and operations 220 and 230 are irrelevant to "determining whether the processing is successful based on a determination as to whether the correction is completed."  (Ex. 1 at Fig. 3.)

3.    **"means for switching to one of a different barcode reading method or processing a new frame of the input image using the current barcode reading method in response to the processing of the input image being unsuccessful" (claim 41)**

| Google's Construction | WSOU's Construction |
|---|---|
| This term is subject to means-plus-function treatment under 35 U.S.C. § 112, ¶ 6. <br><br> Function: "switching to one of a different barcode reading method or processing a new frame of the input image using the current barcode reading method in response to the processing of the input image being unsuccessful" <br><br> Structure: none (indefinite) | Function: "switching to one of a different barcode reading method or processing a new frame of the input image using the current barcode reading method in response to the processing of the input image being unsuccessful" <br><br> Structure: processing element 72, operations 260-270 |

Processing element 72 is a general purpose computer and does not suffice.  (Dkt. 34 at 22.)  Operations 260 and 270 merely repeat the function.  (Ex. 1 at Fig. 3.)

4.    **"means for attempting a decode of the input image using the current barcode reading method in response to the processing of the input image being successful" (claim 41)**

| Google's Construction | WSOU's Construction |
|---|---|
| This term is subject to means-plus-function treatment under 35 U.S.C. § 112, ¶ 6. <br><br> Function: "attempting a decode of the input image using the current barcode reading | Function: "attempting a decode of the input image using the current barcode reading method in response to the processing of the input image being successful" |

| method in response to the processing of the input image being successful"<br><br>Structure: none (indefinite) | Structure: barcode reading element 70, processing element 72, operations 220, 270 |
|---|---|

WSOU's claimed structure is barcode reading element 70, which the specification explains is merely hardware for barcode reading and general computing that fails to provide an algorithm. (Dkt. 34 at 25; *see also* Ex. 1 at 8:52-57.)  Operation 220 merely restates the function, and operation 270 is irrelevant to the function.  (Ex. 1 at Fig. 3.)

5. **"means for performing a switch to the different barcode reading method in response to a failure of the attempt to decode the input image using the current barcode reading method" (claim 41)**

| Google's Construction | WSOU's Construction |
|---|---|
| This term is subject to means-plus-function treatment under 35 U.S.C. § 112, ¶ 6.<br><br>Function: "performing a switch to the different barcode reading method in response to a failure of the attempt to decode the input image using the current barcode reading method"<br><br>Structure: none (indefinite) | Function: "performing a switch to the different barcode reading method in response to a failure of the attempt to decode the input image using the current barcode reading method"<br><br>Structure: barcode reading element 70, processing element 72, operations 230, 270 |

Barcode reading element 70 is merely hardware for barcode reading and general computing and does not suffice.  (Dkt. 34 at 25; *see also* Ex. 1 at 8:52-57.)  Processing element 72 also fails to suffice because it is just a general purpose computer.  (Dkt. 34 at 22.)  Operation 230 is irrelevant to the function of "performing a switch to the different barcode reading method in response to a failure of the attempt to decode the input image using the current barcode reading method," and operation 270 merely restates the function.  (Ex. 1 at Fig. 3.)

6. **Whether the phrase "computer program product comprising at least one computer-readable storage medium having computer-readable program code portions stored therein, the computer-readable program code portions comprising: . . . a first/second/third/fourth/ fifth executable portion for . . ." invokes Section 112 ¶ 6 (claim 13)**

7.      Whether the phrase "apparatus comprising a processor and memory
        including computer program code, the memory and the computer
        program code configured to, with the processor, cause the apparatus
        at least to: . . ." invokes Section 112 ¶ 6 (claim 25)

| Google's Construction | WSOU's Construction |
|---|---|
| For disputed means-plus-function term nos. 6 and 7: the recited functions are identical to the means-plus-function terms in claim 41, thus the only issue is whether this term invokes Section 112 ¶ 6. | For both term nos. 6 and 7: plain and ordinary meaning; does not invoke 35 U.S.C. § 112, ¶ 6; definite. |

As Google explained in its opening brief, these terms invoke means-plus-function treatment under § 112 ¶ 6 because their preambles employ nonce words and fail to provide structure.  (Dkt. 34 at 26.)  The preambles here contain no more substance than those in *Dyfan, LLC v. Target Corp.*, Case No. 19-179, Dkt. No. 57 (W.D. Tex. Nov. 24, 2020), which this Court held requires means-plus-function treatment.  (*Id.* at 15-16.)  The Court of Appeals recently bolstered *Dyfan* by using similar reasoning to apply means-plus-function treatment.  *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, Case No. 2020-1646, 2021 WL 786361, at *2 (Fed. Cir. Mar. 2, 2021).  WSOU cannot overcome this primary point; it cannot come close.

Many of WSOU's reply arguments merely repeat its opening ones, and fail to address Google's points in response.  WSOU argues that claim differentiation overrides § 112 ¶ 6, but fails to address Google's reminder that "the doctrine of claim differentiation cannot override 35 U.S.C. § 112, ¶ 6, which limits the scope of means plus function claims to the corresponding structure, material or acts described in the specification and equivalents thereof." *Trinity Indus., Inc. v. Road Sys., Inc.*, 121 F. Supp. 2d 1028, 1039 (E.D. Tex. 2000) (citing *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1364 (Fed. Cir. 1998)).  (*See* Dkt. 34 at 28.)  WSOU can distinguish this Court's ruling in *Dyfan* only by noting that the claims there did not include the magic words "means for" (Dkt. 36 at 13-14), but fails to address Google's point that its argument would provide patentees a get-out-of-jail-free card simply by including an explicit "means for" claim and then arguing that claim differentiation prevents application of the means-plus-function doctrine anywhere else. (Dkt. 34 at 28-29.)

WSOU palms another get-out-of-jail-free card by asserting that claim 13 is a *Beauregard* claim, and thus cannot be subject to § 112 ¶ 6.  (Dkt. 36 at 14.)  Again, no such card exists, as this Court found in *Dyfan* when it gave means-plus-function treatment to terms such as "an application [computer code] configured for[to be] execution [executed] by at least one of a plurality of mobile devices. . . ."  *Dyfan*, slip op. at 7.  WSOU claims that this language is somehow different from that in *Beauregard*, but does not and cannot explain how.

Next WSOU argues that this Court should ignore *Dyfan* in favor of a ruling from a different Court—entered in a case, WSOU does not say, in which the plaintiff never had standing and which thus should not have happened at all.  (Dkt. 36 at 14; *see Uniloc 2017 LLC v. Google LLC*, Case No. 20-5333, Docket No. 355 (N.D. Cal. Dec. 22, 2020).)  Even assuming that *Uniloc 2017* has any authority after the matter's dismissal for lack of initial standing, it does not help WSOU here, because it found that, "in contrast to the claims in *Williamson*, claims 22, 23, and 24 themselves recite the objectives and operations of the 'computer-readable medium' limitations," because their "language provides a description of how the computer-readable medium is specifically programmed to operate."  *Uniloc 2017 LLC v. Google LLC*, Case No. 18-492, 2020 WL 569858, at *15 (E.D. Tex. Feb. 5, 2020).  WSOU does not and cannot point to where the claims here provide any such description; indeed, they provide less detail than those in *Williamson*.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1345 (Fed. Cir. 2015).

Finally, WSOU refers again to *Collaborative Agreements, LLC v. Adobe Systems Inc.*, Case No. 14-356, 2015 WL 2250391 (W.D. Tex. 2015), which found structure in claims that "refer[red] to a portion of a larger program that, similar to a module, has a specific purpose or performs a specific class of operations."  *Id.* at *14.  WSOU complains that Google "fails to explain why the claim preambles at issue do not invoke analogous reasoning" (Dkt. 36 at 16), invoking Upton Sinclair's maxim:  "It is difficult to get a man to understand something, when his salary depends on his not understanding it."  Simply put:  the "claim preambles at issue do not invoke analogous reasoning" because they do not "refer to a portion of a larger program that, similar to a module, has a specific purpose or performs a specific class of operations," but merely claim generic general-

purpose computers; in other words, they merely "set[] forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used." *Williamson*, 792 F.3d at 1350.

## II.   U.S. PATENT NO. 8,595,283 (CASE NO. 6:20-CV-576-ADA)

### A.   "the selected item of content" (claims 1, 2, 3, 10, 21)

The parties dispute the proper antecedent basis for this term.  Google's construction properly links "the selected item of content" to the preceding language in the claim which requires a user to first select the item "via a user interface."  The dispute would be resolved if WSOU agreed that selection "via a user interface" was part of the antecedent basis.  (Dkt. 34 at 31.)  Rather than respond to Google's brief, WSOU simply repeats verbatim what it said in its initial brief, again ignoring the plain language of the claims.  (Dkt. 33 at 25;  Dkt. 36 at 21.)

### B.   "monitoring usage of one or more components . . . over a particular time duration" (claims 1, 10)

Construction is required to resolve the parties' dispute as to scope.  Google's brief establishes that both the plain meaning and the applicant's prosecution history statements define a "particular time duration" to be "a limited, noninstantaneous period of time."  (Dkt. 34 at 32-33; Exs. 14-16 (defining "duration").)  WSOU's assertion that Google's construction "introduces ambiguity" is belied by the applicant using similar wording to define this term during prosecution, and WSOU's attempt to avoid those statements is contrary to binding precedent.

First, Google need not meet the exacting standard for prosecution disclaimer, as WSOU contends.  (Dkt. 36 at 22-23.)  A proper claim construction must consider the applicant's prosecution history amendments and arguments.  (Dkt. 34 at 31.)  The prosecution history "may be critical in interpreting disputed claim terms because it contains the complete record of all the proceedings before the [PTO], including any express representations made by the applicant regarding the scope of the claims."  *Personalized Media Comms., LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020).  "Accordingly, ***even where prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction.***"  *Id.*  "***For***

*example, an applicant's repeated and consistent remarks during prosecution can define a claim term by demonstrating how the inventor understood the invention*." *Id.* at 1340. "Similarly, an applicant's amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment." *Id.*

As detailed in Google's brief, the applicant's repeated and consistent remarks during prosecution defined the disputed term by demonstrating that the inventor understood "particular time duration" to be a clearly defined period of time that is more than just an instant. (Dkt. 34 at 31-34.)  On multiple occasions, the applicant distinguished prior art from the claims by arguing that the prior art (1) performed *instantaneous* monitoring rather than monitoring over a time duration, and (2) did not *limit* the period of monitoring.  (Dkt. 34 at 32-33.)  WSOU glosses over these statements, and completely ignores the applicant's statements distinguishing between the claimed "duration" and the prior art's "single instance of time." (*Id.*)  Despite WSOU's efforts to obfuscate the record, the prosecution makes clear that the applicant intended the usage of one or more components to be monitored over a clearly defined period of time that is more than just an instant.

Second, the prosecution history statements Google cites are sufficient even if a disclaimer were required.  "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega*, 334 F.3d at 1324-28. Contrary to WSOU's arguments (Dkt. 36 at 23), the applicant made a clear and unmistakable disavowal by repeatedly confining the scope of the disputed term to exclude open-ended periods of monitoring or instantaneous monitoring.  (Dkt. 34 at 32-34.)  Thus, although WSOU appears uncertain about the effect of adding "limited" and "noninstantaneous" to the definition of the disputed term, the effect is clear: to define the scope of the disputed term as intended by the applicant.

C.    **"an acceptable level of device activity" (claim 21)**

Google's brief establishes that claim 21 is indefinite because neither the claim language

nor the specification allows a POSITA to infer the bounds of what constitutes "an acceptable level of device activity." (Dkt. 34 at 34-39.) The specification describes multiple factors that can affect whether the level of device activity is "acceptable"—including the amount and nature of that activity—and a POSITA must subjectively determine which factors to consider. (*Id.*) To compensate for the lack of objective boundaries, WSOU attempts to import language from claim 10 into claim 21 to avoid indefiniteness.

In a one-sentence reply to Google's showing that the nature of device activity is relevant to "acceptability," WSOU relies on a selective and incorrect reading of the specification. WSOU asserts that "the specification merely suggests that a threshold for 'low' could be an 'idle' or 'maintenance' network activity." (Dkt. 36 at 22.) To the contrary, the specification expressly states that certain types of device activity need not be considered when determining the level of device activity. (Ex. 7 at 7:58-64 ("a period of low activity is considered to be present if the device has not been utilized, other than perhaps by maintaining an IDLE connection with a network"); 8:38-40 ("device usage or activity resulting directly from the reception of content is not considered in determining levels of device activity or usage"); 10:17-21 ("low activity period is considered to be present when it is detected that there has been no component usage at all, except for non-user initiated activity").) These passages demonstrate that an "acceptable level of device activity" is purely subjective because a POSITA has discretion to selectively ignore activity of a certain nature and the specification places no limits on that discretion. (*Id.*) WSOU further exposes the lack of an objective standard for acceptability by arguing that "any" threshold is acceptable (Dkt. 36 at 22), which "fails to provide any direction to one skilled in the art attempting to determine the scope of the claimed invention." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). "A term of degree fails to provide sufficient notice of its scope if it depends on the unpredictable vagaries of any one person's opinion." *Id*.

*Intellectual Ventures LLC v. T Mobile USA, Inc.*, which analyzed an analogous subjective term of degree—"to *optimize* end-user quality of service (QoS)"—is instructive. 2018 WL 5809270, at *12 (E.D. Tex. 2018). There, the intrinsic record disclosed that optimizing QoS

depended on "the *types* of data being communicated" and on "*how 'the user defines [QoS]*.'" *Id.* at *11-*12. The court explained that "although the patentee referred to differentiating between different types of data traffic, the patentee *did not define or sufficiently explain the meaning of 'optimize,'* especially in the context of 'end-user' QoS." *Id.* at *12. The thus court concluded that the term "lack[ed] sufficient 'objective boundaries.'" *Id.* The same reasoning yields the same result here, given that the '283 patent differentiates between multiple factors that can influence an acceptable level of device activity (*e.g.*, amount and nature of activity), but fails to explain how to apply the "nature" of device usage to that determination.

Faced with the absence of any objective boundaries in the specification, WSOU contends that claim 10's recitation of determining "an acceptable level of device activity" by comparing component usage to "a particular threshold level" somehow precludes a finding of indefiniteness for claim 21, which does not include such language. Independent claims 10 and 21 are different. Claim 10 involves determining device activity by monitoring usage of one or more components as a condition precedent to initiating transfer of "the selected item of content." Claim 10 expressly requires use of "threshold levels" to determine "an acceptable activity period." (Ex. 7 at 16:50-53.) Claim 21, by contrast, requires "initiating transfer of the selected item of content at a predicted time of acceptable device activity levels" and omits any recitation of component usage or threshold levels. (*Id.* at 18:19-23.) WSOU's attempt to import claim 10's measure of acceptability into claim 21 effectively concedes that claim 21 does not provide an objective measure of acceptability.

Finally, WSOU's argument concerning Google's reliance on the intrinsic evidence is unavailing. "Because indefiniteness applies general principles of claim construction, indefiniteness involves *consideration of primarily* the intrinsic evidence." *IQASR LLC v. Wendt Corp.*, 825 F. Appx. 900, 904 (Fed. Cir. 2020).

**D.** **"a content transfer controller configured to determine an acceptable activity period by monitoring usage of the one or more components over a particular time duration, and wherein the content transfer controller is configured to determine that an acceptable activity period is present when the usage of the one or more components is determined to have been below a particular threshold level over the particular time duration" (claim 1)**

E.     **"the content transfer controller being arranged: to initiate transfer of the selected item of content from a content provider device according to the determination of an acceptable activity period, to receive the selected item of content, and to store the received item of content on memory" (claim 1)**

Google's brief establishes that these terms are subject to § 112, ¶ 6 and indefinite because there is insufficient structure to perform the claimed functions. (Dkt. 34 at 39-43.)

The record refutes WSOU's argument that the presumption against § 112, ¶ 6 stands.  (Dkt. 36 at 18-21.)  <u>First</u>, the claim language is devoid of the required structure because, as WSOU acknowledges, it describes the "content transfer controller" only by the functions it performs, not *what* it is or *how* it performs those functions.  (Dkt. 36 at 19; Dkt. 34 at 41-43.)

<u>Second</u>, WSOU relies on inapposite cases.  This is a different case, involving a different patent, where the claims and specification fail to disclose sufficient structure for the "content transfer controller."  (Dkt. 34 at 30.)  Even if *Virginia Innovation Sciences* and *Barkan Wireless* did not treat "controller" terms in those cases as means-plus-function terms, "[t]he mere fact a similar or even identical term has been construed one way in a given patent does not control construction in later suit over an entirely different patent."  *MonkeyMedia, Inc. v. Apple, Inc.*, 2013 WL 12076550, at *5 (W.D. Tex. Feb. 22, 2013).  Indeed, WSOU ignores this District's more applicable precedent, recognizing that "[t]erms such as 'controller' often connote insufficient structure to take the limitation outside the bounds of Section 112(f)."  *InCom Corp. v. Radiant RFID, LLC*, 2018 WL 4690934, at *5 (W.D. Tex. Sept. 28, 2018) (holding that "tag orientation controller" failed to recite sufficient structure); *MonkeyMedia*, 2013 WL 12076550, at *5 (construing "relativity controller" under § 112, ¶ 6 when the patent described the term functionally without sufficient structure).

Finally, the specification's references to "controller 21" and "CPU" do not supply sufficient structure because the components are only described in general, functional terms.  (Dkt. 34 at 42-43.)  The Federal Circuit's recent decision in *Rain Computing* is instructive.  There, the Federal Circuit held that "disclosure of computer-readable media or storage devices provided [in]sufficient structure for the 'control access' function" because "[t]hese computer-readable

media or storage devices amount to nothing more than a general-purpose computer." 2021 WL 786361, at *4.  "Rather, some special programming, i.e., an algorithm, would be required to control access to the software application packages."  *Id*.  Similarly, here the "controller 21" and "CPU" are insufficient structure to perform the claimed functions because the patent describes them in purely general, functional terms like a general-purpose computer.  (Dkt. 34 at 42-43.) Accordingly, an algorithm is necessary to provide the required structure.  *See Rain*, 2021 WL 786361, at *4 ("[W]here a general purposes computer is the corresponding structure and it is not capable of performing the controlling access function absent specialized software, an algorithm is required.").  Although the '283 patent mentions that the content transfer control means may include an algorithm to "compress" content or predict a low level of device activity, it discloses no further information about the content of such an algorithm and does not provide any linkage to the claimed functions.  (Ex. 7 at 3:28-33, 7:58-8:5, 11:13-18.[3])  In sum, neither "content transfer controller" nor its constituent term "controller" is a sufficiently definite structure to perform the claimed functions, even if embodied as the "controller 21" or "CPU."

## III.    U.S. PATENT NO. 8,640,180 (CASE NO. 6:20-CV-579-ADA)

### A.    "client-side compositing of media streams" (all claims)

| Google's Construction | WSOU's Construction |
|---|---|
| The preamble is limiting | Plain and ordinary meaning |

Google's brief demonstrates that the phrase "client-side compositing of media streams" "discloses a fundamental characteristic of the claimed invention that is properly construed as a limitation of the claim itself." *Poly-Am., L.P. v. GSE Lining Tech. Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004).  As Google explained, this phrase appears in the title, abstract, repeatedly throughout the specification, and every claim.  (Dkt. 34 at 43-45.)  Moreover, the patent extols the benefits of client-side compositing compared to the alternative, "server-side compositing," explaining that

---

[3]      For example, the compression and prediction algorithms are not tied to the determination of the "acceptable activity period" recited in claim 1. (*Id*.)

"embodiments of the present invention composite at least one of the media data streams on a video display device as opposed to the video server."  (Ex. 17 at 1:7-43, 4:56-67.)  Client-side compositing thus is "properly construed as a claim limitation, and not merely a statement of purpose or intended use for the invention, because [it] *is the essence or a fundamental characteristic of the claimed invention*."  *Vizio, Inc. v. ITC*, 605 F.3d 1330, 1340 (Fed. Cir. 2010).

Rather than engage with Google's analysis, WSOU simply repeats its argument that a preamble phrase "is *presumptively* not limiting."  (Dkt. 36 at 24.)  But the presumption against limiting preambles is just that—a presumption—and Google demonstrated how it is overcome by the unique circumstances of the '180 patent.  There is little else of substance in WSOU's reply. Its arguments about antecedent basis, statements of intended purpose, and independent claim 7 were already fully addressed in Google's brief.  (Dkt. 34 at 44-46.)  To the extent WSOU now suggests that claim 7 involves "compositing *by the server*" (Dkt. 36 at 24), that argument is dispelled by the claim language, which says no such thing.  Server-side compositing appears in the '180 patent only as an example of what the invention *is not*.  (Ex. 17 at 1:7-43, 4:56-67.)

**B.      "the compositing-instruction substream indicating the area of the display screen to display the at least one media substream is an area to display one of the on screen display and a picture in picture" (claims 8 and 21)**

| Google's Construction | WSOU's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning |

WSOU's assertions ignore the substance of Google's arguments and instead rely on a rebuttable presumption that the claims are not indefinite.  First, Google explained that the phrase "the area of the display screen *to display the at least one media substream*" in dependent claims 8 and 21 lacks an antecedent basis.  (Dkt. 34 at 36 & n.5.)  WSOU tries to find an antecedent basis by pointing to different, narrower limitations: "an area of the display stream [sic]"[4] and "an aspect ratio of at least one media substream."  (Dkt. 36 at 25.)  Claims 8 and 21 recite a limitation—"the area of the display screen *to display the at* least one media substream"—that does not appear in

---

[4]         The correct claim language is "an area of the display *screen*."

claims 7 and 20.  Separate limitations that address different aspects of the claimed invention cannot provide the antecedent basis for "the area of the display screen" limitation in claims 8 and 21.

Second, WSOU does not even attempt a response to the fact that claims 8 and 21 broaden the independent claims.  Beyond a doubt, instructions indicating an area to place a picture-in-picture satisfy claims 8 and 21 but not claims 7 and 20.  (Dkt. 34 at 36-37.)  WSOU also does not dispute that a dependent claim is indefinite if it purports to broaden the scope of the independent claim.  *Multilayer Stretch, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1362 (Fed. Cir. 2016).

## IV.    U.S. PATENT NO. 8,965,045 (CASE NO. 6:20-CV-574-ADA)

### A.    "pre-emptive user output" (all claims)

WSOU's reply is more notable for what it omits than what it says.  Google's brief establishes—and WSOU does not dispute—that "pre-emptive user output": (i) is a term coined by the '045 patent rather than a term of art; and (ii) does not have any ordinary meaning.  (Dkt. 34 at 49-50.)  In these circumstances, the Federal Circuit instructs that "absent [] an accepted meaning, we construe a claim term *only as broadly as provided for by the patent itself.*"  *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004); *see* Dkt. 34 at 49-51 (analyzing cases holding same).  WSOU simply ignores this controlling precedent.

Google's brief also demonstrates that the '045 patent repeatedly and consistently describes the "pre-emptive user output" as "an output that facilitates a user action to redefine available pixels before the tracked object is lost."  (Dkt. 34 at 50-51.)  The '045 patent makes clear that "a pre-emptive user output [ ] *facilitates or instigates user action that redefines the set of available pixels.*"  (Ex. 18 at 10:22-26.)  The patent further teaches that a "user output *is provided pre-emptively to avoid loss of tracking* when the sub-set of pixels approaches an edge."  (*Id.* at 11:27-29; *see id.* at 12:17-21, 12:45-48.)  WSOU fails to engage this decisive evidence.

Avoiding Google's analysis and Federal Circuit case law, WSOU reprises a series of meritless arguments.  First, relying on Figure 8B and the patent's statement that "other forms of pre-emptive user outputs 110 may be provided," WSOU asserts that Google's construction is

unduly restrictive.  (Dkt. 36 at 26 (quoting Ex. 18 at 11:27-31).)  That quoted passage, however, is entirely consistent with Google's construction.  The fact that the "pre-emptive user output" may take different forms, such as the directional arrow in Figure 8B or different icons, does nothing to alter the meaning of the "preemptive user output" in the '045 patent—namely, "an output that facilitates a user action to redefine available pixels before the tracked object is lost."  That is how the inventors exclusively and repeatedly used the coined term in the patent.

Second, WSOU asserts that the phrase "before the object is lost" in Google's construction lacks lexicography.  (Dkt. 36 at 21.)  Google's brief establishes that the opposite is true.  (Dkt. 34 at 52.)  Expressly defining "pre-emptive" to mean "before the object is lost," the '045 patent states that: "This user output 110 facilitates user action that redefines the set of available pixels *pre-emptively, **that is**, before the tracking of the object is lost*."  (Ex. 18 at 12:45-48.)  As Google's brief demonstrates (Dkt. 34 at 52), the "inventors acted as their own lexicographers" by using the phrase "that is."  *Trading Techs. Int'l, Inc. v. eSpeed Inc.*, 595 F.3d 1340, 1353 (Fed. Cir. 2010).  "[T]he usage 'i.e.' ('id est' or 'that is') signals an intent to define the word to which it refers." *TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1372 (Fed. Cir. 2018).  WSOU has no answer to Google's analysis and the dispositive case law.

Third, WSOU's claim differentiation arguments are contrary to law.  Claim differentiation is inapplicable, because, as WSOU's opening brief recognizes, claims 18 and 19 have different scope under Google's construction.  (Dkt. 34 at 32, 34.)[5]  Courts "decline[] to apply … claim differentiation where, as here, the claims are not otherwise identical in scope."  *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1358 (Fed. Cir. 2016).  WSOU's reply ignores its own stated positions.  Moreover, "claim differentiation is a rule of thumb that does not trump the clear import of the specification."  *Edward Lifescie. LLC v. Cook Inc.*, 582 F.3d 1322, 1332 (Fed. Cir. 2009).  "[A]ny presumption created by the doctrine of claim differentiation *will be overcome by a contrary construction dictated by the written description*."  *Retractable Techs., Inc. v. Becton, Dickinson &*

---

[5]     WSOU improperly rewrites the term "use action" in claim 19 to "use[r] action."  (Dkt. 34 at 32.)

*Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).  Google's brief establishes that because the "pre-emptive user output" term "ha[s] no plain or established meaning" and "cannot be construed broader than the disclosure in the specification," *Indacon*, 824 F.3d at 1357, claim differentiation "cannot enlarge the meaning of a claim beyond that which is supported by the patent documents." *Id*. at 1358.  The "dependent claim tail cannot wag the independent claim dog." *Multilayer Stretch*, 831 F.3d at 1360.  Tellingly, WSOU never addresses this precedent.

**B.**  **"processor configured to provide a pre-emptive user output when the sub-set of pixels approaches an edge of the set of available pixels" (claim 1)**

Google's opening brief demonstrates that this limitation is properly construed under Section 112, ¶ 6 because the phrase "processor configured to," in the context of the claim language and specification, does not connote sufficient structure to perform the recited function.  (Dkt. 34 at 53-54.)  Google also established that specification fails to disclose any corresponding structure for the claimed function under the second step of the means-plus-function analysis—an issue that WSOU waived by not addressing it in its opening brief.  (*Id*.)

WSOU's reply throws a lot of arguments at the wall, none of which stick.  <u>First</u>, the Federal Circuit flatly dismisses WSOU's contention that expert testimony is necessary.  "[N]one of our cases mandate that a party seeking to overcome the presumption against application of § 112, ¶ 6 can only do so by presenting extrinsic evidence that [a POSITA] would fail to understand that a term connotes a definite structure.  Imposing such a requirement would be inconsistent with the Supreme Court's guidance." *Diebold Nixdorf, Inc. v. ITC*, 899 F.3d 1291, 1299 (Fed. Cir. 2018). "[I]n appropriate cases, a party advocating that a claim limitation that does not recite the word 'means' is subject to § 112, ¶ 6 can overcome the presumption against its application *solely by reference to evidence intrinsic to the patent*." *Id*. at 1299-1300; *see Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1373 (Fed. Cir. 2020) ("To determine whether the claim limitation at issue connotes sufficiently definite structure to a [POSITA], *we look first to intrinsic evidence, and then, if necessary*, to the extrinsic evidence.").  So too here.

<u>Second</u>, WSOU wrongly asserts that Google seeks a "per se rule" that the term "processor

configured to" is a means-plus-function term.  (Dkt. 36 at 27.)  Yet, Google's brief expressly notes that binding precedent "requires *a case-specific inquiry*."  (Dkt. 34 at 53.)  <u>Third</u>, WSOU mistakenly argues that this Court's *Dyfan* decision "flips the applicable presumption" for claim terms without the word "means."  (Dkt. 36 at 27-28.)  *Dyfan* explained that applicants cannot "*simply recite two nonce words—'processor'* and 'code'—together in order to essentially write the claim in a means-plus-function format without being subject to § 112, ¶ 6."  *Dyfan*, slip op. at 20 n.4.  In doing so, this Court expressly took account of the appropriate presumptions.  Id. at 3-4.  Moreover, nonce words "may be used in a claim in a manner that is *tantamount to using the word 'means'*" thus invoking § 112, ¶ 6."  *Williamson*, 792 F.3d at 1350.

<u>Fourth</u>, WSOU's discussion of *St. Isadore Research, LLC v. Comerica* and *Optis Cellular Tech. v. Kyocera Corp.* underscore Google's position that Section 112, ¶ 6 applies.  (Dkt. 36 at 28-29.)  In *St. Isadore*, the court held that the term "processor configured to" triggered means-plus-function treatment and noted that Section 112, ¶ 6 may not apply if the claims "*describe how* the data processor accomplishes the claimed functions."  2016 WL 4988246, at *14, *18 (E.D. Tex. 2016.)  WSOU's reply demonstrates that the claims fail to meet this condition.  WSOU points to claim language stating *when—not how*—the claimed function is performed: "*when* the sub-set of pixels approaches an edge of the set of available pixels."  (Dkt. 36 at 28.)  Speaking to this point, the Federal Circuit "*reject[s] the patentee's assertion that language describing when* the computer would perform the function at issue *constituted a sufficient description of the structure* for performing the function."  *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009).

Similarly, WSOU cites *Optis* for the proposition that means-plus-function treatment applies only when the term "'processors' is meant [] to *generically be anything that manipulates data*."  2017 WL 541298, at *26 (E.D. Tex. 2017) (quoted at Dkt. 36 at 28.)  Yet WSOU's citations to the '045 patent show exactly that.  WSOU points to a passage stating that "processing circuity … is configured to read from and write to memory" and may comprise "interfaces" by which "*data* and/or commands are output by the processor [] and … *input* to the processor."  (Ex. 18 at 13:16-

21 (quoted at Dkt. 36 at 28).)  Accordingly, the "question is not whether a claim term recites any structure but whether it recites sufficient structure…. [Plaintiff] does not explain how its 'logic'— even assuming it connotes some possible structure…—amounts to sufficient structure for performing [the claimed] function." *Egenera*, 972 F.3d at 1374 (Fed. Cir. 2020).  The same holds true here.

Finally, WSOU wrongly asserts that "a processor configured to" is somehow structural because the claims disclose the processor's "component interaction."  (Dkt. 36-28-29.)  The claim language simply recites a generic "processor configured to" perform a variety of the different functions.  (Ex. 18 at 15:1-9.)  Moreover, *Williamson* rejects arguments like WSOU's:

> [T]he claim does not describe how the "distributed learning control module" interacts with other components … *in a way that might inform the structural character of the limitation-in-question or otherwise impart structure.*

792 F.3d at 1351; *Media Rts. Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1373 (Fed. Cir. 2015) (holding that § 112, ¶ 6 applies when the patent "only describes the term's function and interaction with other parts in the system" because "[t]his disclosure fails to provide sufficient structure").

Date: March 12, 2021                    Respectfully submitted,

*/s/   Tharan Gregory Lanier, with permission*
*by Michael E. Jones*
Tharan Gregory Lanier (pro hac vice)
**Jones Day**
1755 Embarcadero Road
Palo Alto, California, 94303
+1 (650) 739-3939
+1 (650) 739-3900 facsimile
tglanier@jonesday.com

Michael E. Jones (Texas Bar No. 10929400)
Patrick C. Clutter (Texas Bar No. 24036374)
**Potter Minton, P.C.**
110 North College, Suite 500
Tyler, Texas, 75702
+1 (903) 597-8311
+1 (903) 593-0846 facsimile
mikejones@potterminton.com
patrickclutter@potterminton.com

Matthew S. Warren (California Bar No.
230565)
Jennifer A. Kash (California Bar No. 203679)
(*pro hac vice*)
Erika Warren (California Bar No. 295570)
Warren Lex LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
20-580@cases.warrenlex.com

Sasha Mayergoyz
**Jones Day**
77 W. Wacker Drive
Chicago, IL 60601
+1 (312) 782-3939
smayergoyz@jonesday.com

Tracy A. Stitt
**Jones Day**
51 Louisiana Avenue NW
Washington, DC 20001
+1 (202) 879-3641

tastitt@jonesday.com

Sanjiv P. Laud
**Jones Day**
90 South Seventh Street
Suite 4950
Minneapolis, Minnesota 55402
+ 1 (612) 217-8800
slaud@jonesday.com

Michael A. Lavine
**Jones Day**
555 California Street
26th Floor
San Francisco, California 94104
+1 (415) 626-3939
mlavine@jonesday.com

*Attorneys for Defendant Google LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 12, 2021, I electronically filed this document with the Clerk of Court via the Court's CM/ECF system which will send notification of such filing to all counsel of record, all of whom have consented to electronic service in this action.

I also hereby certify that all counsel of record who have consented to electronic service are being served with the sealed exhibit pertaining to this filing, pursuant to L.R. CV-5(a)(7) on March 12, 2021, via electronic mail.

*/s/ Michael E. Jones*

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I certify that the separately filed exhibit to the foregoing document is authorized to be filed under seal pursuant to the Protective Order in this case and Judge Albright's Standing Order Regarding Filing Documents Under Seal in patent Cases and Redacted Pleadings.

*/s/ Michael E. Jones*